1    Robert O. Whyte (SBN 130021)
     Christina A. Dondero (SBN 230616)
2    **NIESAR & WHYTE, LLP**
3    90 New Montgomery Street, 9th Floor
     San Francisco, California 94105
4    Telephone: (415) 882-5300
     Facsimile: (415) 882-5400
5

6    Attorneys for Plaintiff/Counter-Defendant
     PicketFence, Inc. doing
7    business as SandBox Studio

8                    UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10                     SAN FRANCISCO DIVISION

11

12   PICKETFENCE, INC., a California corporation     **Case No. C 07-1551 JL**
     doing business as SANDBOX STUDIO,
13                                                   **STIPULATION TO FILE A SECOND**
                        Plaintiff,                   **AMENDED COMPLAINT;**
14                                                   **[PROPOSED] ORDER THEREON**
     v.
15
     R. R. DONNELLEY & SONS COMPANY, a
16   Delaware corporation; and DOES 1 through 30,
     inclusive,
17
                        Defendants
18
     R. R. DONNELLEY & SONS COMPANY, a
19   Delaware corporation;
20                   Counterclaimant,
21   v.
22   PICKETFENCE, INC., a California corporation
     doing business as SANDBOX STUDIO,
23
                   Counter-Defendant.
24
          IT IS HEREBY STIPULATED by and between Plaintiff/Counter-Defendant
25
     PicketFence, Inc., a California Corporation doing business as SandBox Studio ("SandBox") on
26
     the one hand, and Defendant/Counter-Claimant R.R. Donnelley & Sons Company
27
28                                           - 1 -

("Donnelley"), on the other hand, through its attorneys of record, as follows:

1. After filing the First Amended Complaint on or around January 9, 2008, SandBox discovered there were certain inadvertent typographical errors contained in the First Amended Complaint.

2. SandBox requested that SandBox be permitted to file and serve a Second Amended Complaint via Stipulation and Order. SandBox provided Donnelley a copy of the proposed Second Amended Complaint for its review and approval.

3. Donnelley agreed that SandBox be permitted to file its Second Amended Complaint via stipulation.

In light of the foregoing recitals:

**IT IS HEREBY STIPULATED AND AGREED:**

1. SandBox may file and serve a Second Amended Complaint, a copy of which is attached hereto as **Exhibit A.**

**2.** Donnelley's previously-filed Answer, Affirmative Defenses and Counterclaim to the Amended Complaint shall stand as its Answer, Affirmative Defenses and Counterclaim to the Second Amended Complaint.

**SO STIPULATED.**

Dated: September 10, 2008        **NIESAR & WHYTE LLP**

By: /s/ Robert O. Whyte
Robert O. Whyte
**NIESAR & WHYTE LLP**
Attorneys for Plaintiff/Counter-Defendant
PicketFence, Inc. doing business as SandBox Studio

Dated: September 10, 2008        **SHAW GUSSIS FISHMAN GLANTZ WOLFSON & TOWBIN LLC**

By: /s/ Jeffrey L. Widman
Jeffrey L. Widman (*Admitted Pro Hac Vice*)
**SHAW GUSSIS FISHMAN GLANTZ WOLFSON & TOWBIN LLC.**
Attorneys for Defendant/Counter-ClaimantR.R. Donnelley & Sons Company

Signatures continued on next page

- 2 -

Dated: September 10, 2008

**FUTTERMAN & DUPREE LLP**

By: /s/ Jamie L. Dupree
    Jamie L. Dupree
    **FUTTERMAN & DUPREE LLP**
    Attorneys for Defendant
    R.R. Donnelley & Sons Company


**ORDER**

IT IS SO ORDERED:

Date: September 22, 2008

The Honorable James Larson

- 3 -

**Exhibit A**

ROBERT O. WHYTE (SBN 130021)
CHRISTINA A. DONDERO (SBN 230616)
**NIESAR & WHYTE LLP**
90 New Montgomery Street, 9th Floor
San Francisco, California 94105
Telephone: (415) 882-5300
Facsimile: (415) 882-5400

Attorneys for Plaintiff/Counter-Defendant
PicketFence, Inc. doing
business as SandBox Studio

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| PICKETFENCE, INC., a California corporation doing business as SANDBOX STUDIO,<br><br>Plaintiff,<br><br>v.<br><br>R. R. DONNELLEY & SONS COMPANY, a Delaware corporation; and DOES 1 through 30, inclusive,<br><br>Defendants | **Case No. C 07-1551 JL**<br><br>**SECOND AMENDED COMPLAINT FOR DAMAGES, IMPOSITION OF CONSTRUCTIVE TRUST, DECLARATORY RELIEF, INJUNCTIVE RELIEF, AND AN ACCOUNTING** |

AND RELATED COUNTERCLAIM

Plaintiff PicketFence, Inc. doing business as SandBox Studio alleges as follows:

## GENERAL ALLEGATIONS

1.     Plaintiff PicketFence, Inc. is, and at all times herein mentioned was, a California corporation authorized to do business in the City and County of San Francisco, California under the fictitious business name SandBox Studio (hereinafter "SandBox").

2.     SandBox is informed and believes and on that basis alleges that Defendant R. R. Donnelley & Sons Company (hereinafter "RRD") is and at all times herein mentioned was, a Delaware corporation doing business in the City and County of San Francisco, California.

-1-

3.     SandBox is not presently aware of the true names and capacities of defendants sued herein as Does 1 through 30, inclusive.  When the true names and capacities of the Doe defendants are ascertained, SandBox will amend this complaint to allege and include that information.

4.     SandBox is informed and believes, and on that basis alleges, that each of the defendants was or is the agent, representative, co-conspirator and/or employee of each other defendants and, in doing the things alleged in this complaint, was acting within the normal course and scope of that relationship.  SandBox is further informed and believes, and on that basis alleges, that each of the defendants ratified each of the acts of each other defendant complained of herein.  As a result of such relationship or otherwise, each of the defendants was and is responsible is some manner for the occurrences and damages described in this complaint.

## BACKGROUND ALLEGATIONS

5.     For the past fifteen years, SandBox has provided high quality digital and film "Photography Services," both still and interactive, for retail businesses, catalog businesses and e-commerce businesses located in several of the states in the United States of America.  SandBox provides said photography services on-site at its own facilities in San Francisco and New York, on-site at client facilities, and at locations selected jointly with clients to attain appropriate backgrounds such as scenic and architectural sites.

6.     RRD provides, among other things, "Prepress Services" in the form of scanning, color correction, image manipulation, page assembly, production of proofs to provide press-ready, final page elements, and digital asset management services to the same types of businesses as those to whom SandBox provides its photography services.

7.     On or about February 18, 2005 SandBox and RRD entered into a written contract entitled "STRATEGIC ALLIANCE AGREEMENT" (hereinafter referred to as the "Agreement") under which SandBox on the one hand, and RRD through an entity by the name of Iridio, Inc. on the other hand, agreed to provide certain complementary services in the area of digital Photography and Prepress Services to clients in a defined Northern California Territory, which

-2-

1   included and includes the City and County of San Francisco. A true and correct copy of said

2   Agreement is attached hereto as **Exhibit A**.

3       8.   In the Agreement, "Photography Services" was defined to mean digital and film

4   photography services, both still and interactive, including such services provided on-site at a

5   client facility located in the agreed upon territory through what was defined as a "Facilities

6   Management" agreement.

7       9.   In connection with the Agreement, "Prepress Services" was defined to mean

8   scanning, color correction, image manipulation, page assembly, production of proofs to provide

9   press-ready, final page elements, and digital asset management services, including such services

10  provided on-site at a client facility located in the agreed upon territory through what was defined

11  as a "Facilities Management" agreement.

12      10.  For purposes of the Agreement, a "Facilities Management" account was defined as

13  a classification , which may include, but not be limited to, the following factors: the presence of

14  "on-site" or "near-site" RRD employees required as part of the agreement and/or the account

15  requires significant resources requiring workflow analysis and infrastructure investment to enable

16  the appropriate client solution.

17      11.  Section 2.3 of the Agreement, provides that all "Photography Services" identified

18  by RRD, through Iridio's sales team, in the agreed upon territory will be "referred exclusively to

19  SandBox", that SandBox "shall have a right of first refusal to sell, co-sell or provide such

20  photography services to Iridio [RRD] clients", and that "RRD will obtain SandBox' prior consent

21  before engaging in discussions to provide Facilities Management services to a then-current

22  SandBox Photography Services customer".

23      12.  Paragraph 1 of Exhibit A to the Agreement entitled "Referral Fees", provides that

24  RRD shall pay SandBox a referral fee of 8% of the gross sales of any Prepress Services

25  subsequently provided as further defined in paragraph 5 of Exhibit A to the Agreement for any

26  and all new "Prepress Services" performed by RRD during the term of the Agreement, regardless

27  as to whether or not services are provided within said defined Northern California Territory.

28

-3-

# FIRST CAUSE OF ACTION
## (Breach of Contract)

13.    SandBox alleges and incorporates herein by reference Paragraphs 1 through 12 inclusive, of complaint as though fully set forth herein.

14.    As set forth above, SandBox alleges, that RRD, and Does 1-30, and each of them, entered into the Agreement with SandBox.

15.    SandBox duly performed all conditions, covenants, and promises required to be performed on its part in accordance with terms and conditions of the Agreement, save and except for those obligations that have been excused or waived by RRD, and Does 1-30's joint and several acts and/or omissions.

16.    SandBox is informed and believes, and on that basis alleges, that defendant RRD, and Does 1-30, and each of them, breached the Agreement by, among other things:

    a.    Failing and refusing to provide SandBox with a right of first refusal to sell, co-sell or provide such photography services to the retail chain "Meryvn's" in connection with a Request For Proposal issued by Mervyn's in violation of Section 2.3 of the Agreement; and

    b.    Engaging in discussions with the retail chain "Mervyn's" to provide Facilities Management services to Mervyn's in connection with a Request For Proposal issued by Mervyn's, which retail chain was a customer of SandBox as identified in paragraph 8 to Exhibit A to the Agreement, without the prior consent of SandBox.

    c.    Failing and refusing to pay SandBox a referral fee in connection with SandBox' good faith action, pursuant to the letter and spirit of the Agreement, of advising RRD of an opportunity to jointly offer Photography and Prepress Services to Target, an agreed upon pre-existing client of SandBox, at Target's Minneapolis, Minnesota location in violation of Exhibit A to the Agreement;

    d.    Presenting and receiving a contract from Target, an agreed upon pre-existing client of SandBox, for both Photography and Prepress Services in violation of Exhibit A

-4-

to the Agreement after refusing and failing to present a joint proposal to Target for Photography and Prepress Services.

17. As a proximate and legal result of the contractual breach by defendant RRD, and Does 1-30, and each of them, SandBox has suffered damages in an amount to be proven at trial, but believed to be in excess of the jurisdictional minimum of the Court together with accrued and unpaid interest thereon at the legal rate, and SandBox has suffered direct consequential and special damages, including but not limited to, lost profits. SandBox will seek leave to amend this complaint to allege the precise amount of such damage when the same has been ascertained.

WHEREFORE, SandBox prays for relief as hereinafter set forth.

## SECOND CAUSE OF ACTION
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

18. SandBox alleges and incorporates herein by reference Paragraphs 1 through 17 inclusive, of the complaint as though fully set forth herein.

19. Implied in the Agreement is a covenant of good faith and fair dealing wherein defendant RRD, and Does 1-30, and each of them, agreed that it would not do any acts which would have the effect of frustrating or preventing SandBox' enjoyment of the benefits of the Agreement.

20. Defendant RRD, and Does 1-30, and each of them, breached the covenant of good faith and fair dealing by, among other things:

a. Failing and refusing to provide SandBox with a right of first refusal to sell, co-sell or provide such photography services to the retail chain "Meryvn's" in connection with a Request For Proposal issued by Mervyn's in violation of Section 2.3 of the Agreement;

b. Engaging in discussions with the retail chain "Mervyn's" to provide Facilities Management services to Mervyn's in connection with a Request For Proposal issued by Mervyn's, which retail chain was a customer of SandBox as identified in paragraph 8 to Exhibit A to the Agreement, without the prior consent of SandBox;

-5-

c. Interfering with and/or damaging SandBox' business relationship with the retail chain "Mervyn's";

d. Failing and refusing to pay SandBox a referral fee in connection with SandBox' good faith action, pursuant to the letter and spirit of the Agreement, of advising RRD of an opportunity to jointly offer Photography and Prepress Services to the Target, an agreed upon pre-existing client of SandBox, at Target's Minneapolis, Minnesota location in violation of Exhibit A to the Agreement;

e. Having Michael Sinigaglia an employee of RRD, threaten to have RRD take punitive action against SandBox in the event SandBox decides to pursue Photography Services opportunities outside of the Northern California Territory; and

f. Presenting and receiving a contract from Target, an agreed upon pre-existing client of SandBox, for both Photography and Prepress Services in violation of Exhibit A to the Agreement after refusing and failing to present a joint proposal to Target for Photography and Prepress Services.

21. Defendant RRD, and Does 1-30, and each of them, were in a superior position with, among other things, superior knowledge regarding access to a Request For Proposal prepared by "Mervyn's", and said defendants were in a superior position with respect to responding to Mervyn's Request For Proposal. SandBox was particularly vulnerable in that SandBox was denied participation in responding to Mervyn's Request For Proposal, which effectively terminated SandBox' right to sell, co-sell or provide photography services to Mervyn's.

22. As a direct and proximate result of RRD's, and Does 1-30's, and each of their breach of the covenant of good faith and fair dealing, SandBox has suffered damages in an amount to be proven at trial, but believed to be in excess of the jurisdictional minimum of the Court together with accrued and unpaid interest thereon at the legal rate, and SandBox has suffered direct consequential and special damages, including but not limited to, lost profits. SandBox will seek leave to amend this complaint to allege the precise amount of such damage

-6-

when the same has been ascertained.

WHEREFORE, SandBox prays for relief as hereinafter set forth.

### THIRD CAUSE OF ACTION
### (Conversion)

23. SandBox alleges and incorporates herein by reference Paragraphs 1 through 22 inclusive, of the complaint as though fully set forth herein.

24. At all times relevant herein, SandBox was and is the owner, and was and is entitled to: a right of first refusal to sell, co-sell or provide such photography services to the retail chain "Meryvn's" in connection with a Request For Proposal issued by Mervyn's in connection with Section 2.3 of the Agreement; have RRD seek SandBox' consent prior to engaging in discussions to provide Facilities Management services to such businesses as Mervyn's; receive a referral fee in connection with SandBox' good faith action, pursuant to the letter and spirit of the Agreement, of advising RRD of an opportunity to jointly offer Photography and Prepress Services to the Target, an agreed upon pre-existing client of SandBox; and have RRD refrain from presenting and receiving a contract from Target, an agreed upon pre-existing client of SandBox, for both Photography and Prepress Services in violation of Exhibit A to the Agreement after refusing and failing to present a joint proposal to Target for Photography and Prepress Services.

25. Commencing in or about 2006 and up to the present date and continuing, RRD, and Does 1-30 and each of them wrongfully took the above-mentioned rights from SandBox and converted same to their own use, benefit and enjoyment.

26. SandBox has made prior demand upon RRD, and Does 1-30 and each of them for full return of the value of the above-mentioned rights, but said defendants have failed and refused, and continue to fail and refuse, to return the value of the above-mentioned rights.

27. The value of the aforementioned rights converted by RRD, and Does 1-30 and each of them and the amount of damages suffered by SandBox as a result of said defendants' conversion is in an amount to be proven at trial, but believed to be in excess of the jurisdictional minimum of the Court together with accrued and unpaid interest thereon at the legal rate, and believed to include direct consequential and special damages, including but not limited to, lost

-7-

1    profits. SandBox will seek leave to amend this complaint to allege the precise amount of such

2    damage when the same has been ascertained.

3         28.    The aforementioned acts of RRD, and Does 1-30 and each of them were, wanton,

4    malicious and oppressive, and were undertaken in conscious disregard of SandBox' rights, and

5    justify an award of exemplary and punitive damages.

6         WHEREFORE, SandBox prays for relief as hereinafter set forth.

7                        **FOURTH CAUSE OF ACTION**
                   **(Fraud-Concealment and Suppression)**

8         29.    SandBox alleges and incorporates herein by reference Paragraphs 1 through 28

9    inclusive, of the complaint as though fully set forth herein.

10        30.    At or around the time SandBox executed the Agreement, RRD, and Does 1-30 and

11   each of them, and Mary Lee Schneider, RRD's duly authorized signer, represented that: SandBox

12   had and would have a right of first refusal to sell, co-sell or provide photography services to such

13   businesses as Mervyn's; RRD would obtain the consent of SandBox prior to engaging in

14   discussions to provide Facilities Management services to such businesses as Mervyn's; RRD

15   would pay SandBox a referral fee in connection with SandBox' good faith action, pursuant to the

16   letter and spirit of the Agreement, of advising RRD of an opportunity to jointly offer Photography

17   and Prepress Services to the Target, an agreed upon pre-existing client of SandBox, at Target's

18   Minneapolis, Minnesota location in violation of Exhibit A to the Agreement; and RRD would not

19   present and receive a contract from Target, an agreed upon pre-existing client of SandBox, for

20   both Photography and Prepress Services in violation of Exhibit A to the Agreement after refusing

21   and failing to present a joint proposal to Target for Photography and Prepress Services.

22        31.    Defendants RRD, and Does 1-30, and each of them committed acts of fraud by,

23   among other things, inducing SandBox to enter into the Agreement with the intent to deceive

24   Sandbox and the secret intention of later disavowing that: SandBox had and would have a right of

25   first refusal to sell, co-sell or provide photography services to such businesses as Mervyn's; RRD

26   would obtain the consent of SandBox prior to engaging in discussions to provide Facilities

27   Management services to such businesses as Mervyn's; RRD would pay SandBox a referral fee in

28                                      -8-

1    connection with SandBox' good faith action, pursuant to the letter and spirit of the Agreement, of

2    advising RRD of an opportunity to jointly offer Photography and Prepress Services to the Target,

3    an agreed upon pre-existing client of SandBox, at Target's Minneapolis, Minnesota location in

4    violation of Exhibit A to the Agreement; and RRD would not present and receive a contract from

5    Target, an agreed upon pre-existing client of SandBox, for both Photography and Prepress

6    Services in violation of Exhibit A to the Agreement after refusing and failing to present a joint

7    proposal to Target for Photography and Prepress Services. These secret intentions of said

8    defendants and each of them, were concealed and suppressed from SandBox.

9        32.    At the time of RRD's, and Does 1-30's and each of their secret intentions of

10   concealment and suppression of facts from SandBox, SandBox did not know the same. Had

11   SandBox known the true facts, it would not have entered into the Agreement with said defendants

12   and would not have rendered any performance thereunder.

13       33.    SandBox reasonably relied upon RRD's, and Does 1-30's and Mary Lee

14   Schneider's, each of their representations as set forth above in paragraph 30.

15       34.    SandBox' reliance on said defendants' false representations was reasonable and

16   justified in that said defendants, represented that: SandBox had and would have a right of first

17   refusal to sell, co-sell or provide photography services to such businesses as Mervyn's; RRD

18   would obtain the consent of SandBox prior to engaging in discussions to provide Facilities

19   Management services to such businesses as Mervyn's; RRD would pay SandBox a referral fee in

20   connection with SandBox' good faith action, pursuant to the letter and spirit of the Agreement, of

21   advising RRD of an opportunity to jointly offer Photography and Prepress Services to the Target,

22   an agreed upon pre-existing client of SandBox, at Target's Minneapolis, Minnesota location in

23   violation of Exhibit A to the Agreement; and RRD would not present and receive a contract from

24   Target for both Photography and Prepress Services in violation of Exhibit A to the Agreement

25   after refusing and failing to present a joint proposal to Target, an agreed upon pre-existing client

26   of SandBox, for Photography and Prepress Services.

27

28
                                              -9-

35. The aforementioned acts of RRD, and Does 1-30 and each of them, were wanton, malicious, and oppressive and were undertaken in conscious disregard of SandBox' rights and justify an award of exemplary and punitive damages.

36. As a direct and proximate result of RRD's, and Does 1-30's misrepresentations, SandBox has suffered damages in an amount to be proven at trial, but believed to be in excess of the jurisdictional minimum of the Court together with accrued and unpaid interest thereon at the legal rate, and SandBox has suffered direct consequential and special damages, including but not limited to, lost profits. SandBox will seek leave to amend this complaint to allege the precise amount of such damage when the same has been ascertained.

37. As a direct and proximate result of RRD's, and Does 1-30's concealment and suppression, SandBox has suffered damages in an amount to be proven at trial, but believed to be in excess of the jurisdictional minimum of the Court together with accrued and unpaid interest thereon at the legal rate, and SandBox has suffered direct consequential and special damages, including but not limited to, lost profits. SandBox will seek leave to amend this complaint to allege the precise amount of such damage when the same has been ascertained.

38. The aforementioned acts of RRD, and Does 1-30 and each of them, were wanton, malicious, and oppressive and were undertaken in conscious disregard of SandBox' rights and justify an award of exemplary and punitive damages.

WHEREFORE, SandBox prays for relief as hereinafter set forth.

## FIFTH CAUSE OF ACTION
### (Fraud-Intentional Misrepresentation)

39. SandBox alleges and incorporates herein by reference Paragraphs 1 through 38 inclusive, of the complaint as though fully set forth herein.

40. At or around the the time SandBox executed the Agreement, RRD, and Does 1-30 and each of them, and Mary Lee Schneider, RRD's duly authorized signer, represented to Sandbox that: SandBox had and would have a right of first refusal to sell, co-sell or provide photography services to such businesses as Mervyn's; RRD would obtain the consent of SandBox prior to engaging in discussions to provide Facilities Management services to such businesses as

-10-

1  Mervyn's; RRD would pay SandBox a referral fee in connection with SandBox' good faith action,

2  pursuant to the letter and spirit of the Agreement, of advising RRD of an opportunity to jointly

3  offer Photography and Prepress Services to the Target, an agreed upon pre-existing client of

4  SandBox, at Target's Minneapolis, Minnesota location in violation of Exhibit A to the

5  Agreement; and RRD would not present and receive a contract from Target, an agreed upon pre-

6  existing client of SandBox, for both Photography and Prepress Services in violation of Exhibit A

7  to the Agreement after refusing and failing to present a joint proposal to Target for Photography

8  and Prepress Services.

9      41.   SandBox reasonably relied upon RRD's, and Does 1-30's and Mary Lee

10  Schneider's, each of their representations as set forth in paragraph 40 above.

11     42.   At or around the the time of entering into the Agreement, RRD, and Does 1-30 and

12  each of them, and Mary Lee Schneider, RRD's duly authorized signer,  made the following

13  representations to SandBox with the intent to defraud: SandBox had and would have a right of

14  first refusal to sell, co-sell or provide photography services to such businesses as Mervyn's; RRD

15  would obtain the consent of SandBox prior to engaging in discussions to provide Facilities

16  Management services to such businesses as Mervyn's; RRD would pay SandBox a referral fee in

17  connection with SandBox' good faith action, pursuant to the letter and spirit of the Agreement, of

18  advising RRD of an opportunity to jointly offer Photography and Prepress Services to the Target,

19  an agreed upon pre-existing client of SandBox, at Target's Minneapolis, Minnesota location in

20  violation of Exhibit A to the Agreement; and RRD would not present and receive a contract from

21  Target, an agreed upon pre-existing client of SandBox, for both Photography and Prepress

22  Services in violation of Exhibit A to the Agreement after refusing and failing to present a joint

23  proposal to Target for Photography and Prepress Services.

24     43.   Defendants RRD, and Does 1-30, and each of them committed acts of fraud by,

25  among other things, inducing SandBox to enter into the Agreement and act in reliance on these

26  representations in the manner hereafter alleged, or with the expectation that: SandBox had and

27  would have a right of first refusal to sell, co-sell or provide photography services to such

28

-11-

1   businesses as Mervyn's; RRD would obtain the consent of SandBox prior to engaging in

2   discussions to provide Facilities Management services to such businesses as Mervyn's; RRD

3   would pay SandBox a referral fee in connection with SandBox' good faith action, pursuant to the

4   letter and spirit of the Agreement, of advising RRD of an opportunity to jointly offer Photography

5   and Prepress Services to the Target, an agreed upon pre-existing client of SandBox, at Target's

6   Minneapolis, Minnesota location in violation of Exhibit A to the Agreement; and RRD would not

7   present and receive a contract from Target, an agreed upon pre-existing client of SandBox, for

8   both Photography and Prepress Services in violation of Exhibit A to the Agreement after refusing

9   and failing to present a joint proposal to Target for Photography and Prepress Services..

10       44. Defendants RRD, and Does 1-30 committed acts of fraud by, among other things:

11   a.  Failing and refusing to provide SandBox with a right of first refusal to sell, co-sell or

12       provide such photography services to the retail chain "Meryvn's" in connection with a

13       Request For Proposal issued by Mervyn's in violation of Section 2.3 of the

14       Agreement;

15   b.  Engaging in discussions with the retail chain "Mervyn's" to provide Facilities

16       Management services to Mervyn's in connection with a Request For Proposal issued

17       by Mervyn's, which retail chain was a customer of SandBox as identified in

18       paragraph 8 to Exhibit A to the Agreement, without the prior consent of SandBox;

19   c.  Interfering with and/or damaging SandBox' business relationship with the retail chain

20       "Mervyn's";

21   d.  Failing and refusing to pay SandBox a referral fee in connection with SandBox' good

22       faith action, pursuant to the letter and spirit of the Agreement, of advising RRD of an

23       opportunity to jointly offer Photography and Prepress Services to the Target, an agreed

24       upon pre-existing client of SandBox, at Target's Minneapolis, Minnesota location in

25       violation of Exhibit A to the Agreement; and

26   e.  Presenting and receiving a contract from Target, an agreed upon pre-existing client of

27       SandBox, for both Photography and Prepress Services in violation of Exhibit A to the

28

-12-

1      Agreement after refusing and failing to present a joint proposal to Target for

2      Photography and Prepress Services.

3          45.    The aforementioned acts of RRD, and Does 1-30 and each of them, were wanton,

4   malicious, and oppressive and were undertaken in conscious disregard of SandBox' rights and

5   justify an award of exemplary and punitive damages.

6          46.    As a direct and proximate result of RRD's, and Does 1-30's misrepresentations,

7   SandBox has suffered damages in an amount to be proven at trial, but believed to be in excess of

8   the jurisdictional minimum of the Court together with accrued and unpaid interest thereon at the

9   legal rate, and SandBox has suffered direct consequential and special damages, including but not

10  limited to, lost profits.  SandBox will seek leave to amend this complaint to allege the precise

11  amount of such damage when the same has been ascertained.

12         47.    The aforementioned acts of RRD, and Does 1-30 and each of them, were wanton,

13  malicious, and oppressive and were undertaken in conscious disregard of SandBox' rights and

14  justify an award of exemplary and punitive damages.

15         WHEREFORE, SandBox prays for relief as hereinafter set forth.

### SIXTH CAUSE OF ACTION
### (Fraud-False Promise)

16

17         48.    SandBox  alleges and incorporates herein by reference Paragraphs 1 through 47

18  inclusive, of the complaint as though fully set forth herein.

19         49.    At or around the time SandBox executed the Agreement, RRD, and Does 1-30 and

20  each of them, and Mary Lee Schneider, RRD's duly authorized signer, made the following written

21  and verbal promises showing that defendants intended that: SandBox had and would have a right

22  of first refusal to sell, co-sell or provide photography services to such businesses as Mervyn's;

23  RRD would obtain the consent of SandBox prior to engaging in discussions to provide Facilities

24  Management services to such businesses as Mervyn's; RRD would pay SandBox a referral fee in

25  connection with SandBox' good faith action, pursuant to the letter and spirit of the Agreement, of

26  advising RRD of an opportunity to jointly offer Photography and Prepress Services to the Target,

27  an agreed upon pre-existing client of SandBox, at Target's Minneapolis, Minnesota location in

28

-13-

1    violation of Exhibit A to the Agreement; and RRD would not present and receive a contract from

2    Target, an agreed upon pre-existing client of SandBox, for both Photography and Prepress

3    Services in violation of Exhibit A to the Agreement after refusing and failing to present a joint

4    proposal to Target for Photography and Prepress Services. All of these promises were essential

5    and material to the Agreement.

6         50.    SandBox reasonably relied upon RRD's, and Does 1-30's and Mary Lee

7    Schneider's, each of their representations as set forth in paragraph 49 above.

8         51.    At the time RRD, and Does 1-30 made this representation, said defendants had no

9    no intention of: providing SandBox with a right of first refusal to sell, co-sell or provide

10    photography services to such businesses as Mervyn's; RRD would obtain the consent of SandBox

11    prior to engaging in discussions to provide Facilities Management services to such businesses as

12    Mervyn's; paying SandBox a referral fee in connection with SandBox' good faith action, pursuant

13    to the letter and spirit of the Agreement, of advising RRD of an opportunity to jointly offer

14    Photography and Prepress Services to the Target, an agreed upon pre-existing client of SandBox,

15    at Target's Minneapolis, Minnesota location in violation of Exhibit A to the Agreement; and

16    refraining from presenting and receiving a contract from Target, an agreed upon pre-existing

17    client of SandBox, for both Photography and Prepress Services in violation of Exhibit A to the

18    Agreement after refusing and failing to present a joint proposal to Target for Photography and

19    Prepress Services.

20         52.    Defendants RRD, and Does 1-30 made this representation with the intention of

21    inducing SandBox to act in reliance on this representation in the manner hereafter alleged, or with

22    the expectation that SandBox would so act. SandBox was not aware at the time these

23    representations were made by said defendants that the representations were false and constituted a

24    false promise.

25         53.    Defendants RRD, and Does 1-30 committed acts of fraud and failed to perform on

26    its promises by, among other things:

27         a.  Failing and refusing to provide SandBox with a right of first refusal to sell, co-sell or

28

-14-

1  provide such photography services to the retail chain "Meryvn's" in connection with a

2  Request For Proposal issued by Mervyn's in violation of Section 2.3 of the

3  Agreement;

4  b.  Engaging in discussions with the retail chain "Mervyn's" to provide Facilities

5  Management services to Mervyn's in connection with a Request For Proposal issued

6  by Mervyn's, which retail chain was a customer of SandBox as identified in

7  paragraph 8 to Exhibit A to the Agreement, without the prior consent of SandBox;

8  c.  Interfering with and/or damaging SandBox' business relationship with the retail chain

9  "Mervyn's";

10  d.  Failing and refusing to pay SandBox a referral fee in connection with SandBox' good

11  faith action, pursuant to the letter and spirit of the Agreement, of advising RRD of an

12  opportunity to jointly offer Photography and Prepress Services to the Target, an agreed

13  upon pre-existing client of SandBox, at Target's Minneapolis, Minnesota location in

14  violation of Exhibit A to the Agreement; and

15  e.  Presenting and receiving a contract from Target, an agreed upon pre-existing client of

16  SandBox, for both Photography and Prepress Services in violation of Exhibit A to the

17  Agreement after refusing and failing to present a joint proposal to Target for

18  Photography and Prepress Services.

19  54.  As a direct and proximate result of RRD's, and Does 1-30's misrepresentations,

20  SandBox has suffered damages in an amount to be proven at trial, but believed to be in excess of

21  the jurisdictional minimum of the Court together with accrued and unpaid interest thereon at the

22  legal rate, and SandBox has suffered direct consequential and special damages, including but not

23  limited to, lost profits. SandBox will seek leave to amend this complaint to allege the precise

24  amount of such damage when the same has been ascertained.

25  55.  The aforementioned acts of RRD, and Does 1-30 and each of them, were wanton,

26  malicious, and oppressive and were undertaken in conscious disregard of SandBox' rights and

27  justify an award of exemplary and punitive damages.

28

-15-

WHEREFORE, SandBox  prays for relief as hereinafter set forth.

## SEVENTH CAUSE OF ACTION
### (Negligent Misrepresentation)

56.    SandBox  alleges and incorporates herein by reference Paragraphs 1 through 55 inclusive, of the complaint as though fully set forth herein.

57.    At or around the time SandBox executed the Agreement, RRD, and Does 1-30 and each of them, and Mary Lee Schneider, RRD's duly authorized signer,  represented that: SandBox had and would have a right of first refusal to sell, co-sell or provide photography services to such businesses as Mervyn's; RRD would obtain the consent of SandBox prior to engaging in discussions to provide Facilities Management services to such businesses as Mervyn's; RRD would pay SandBox a referral fee in connection with SandBox' good faith action, pursuant to the letter and spirit of the Agreement, of advising RRD of an opportunity to jointly offer Photography and Prepress Services to the Target, an agreed upon pre-existing client of SandBox, at Target's Minneapolis, Minnesota location in violation of Exhibit A to the Agreement; and RRD would not present and receive a contract from Target, an agreed upon pre-existing client of SandBox, for both Photography and Prepress Services in violation of Exhibit A to the Agreement after refusing and failing to present a joint proposal to Target for Photography and Prepress Services.

58.    SandBox reasonably relied upon RRD's, and Does 1-30's and Mary Lee Schneider's, each of their representations as set forth above in paragraph 57 above.

59.    At the time RRD, and Does 1-30 made this representation, said defendants knew or should have known that said representation was false in that said defendants had no intention of: providing SandBox with a right of first refusal to sell, co-sell or provide photography services to such businesses as Mervyn's; RRD would obtain the consent of SandBox prior to engaging in discussions to provide Facilities Management services to such businesses as Mervyn's; paying SandBox a referral fee in connection with SandBox' good faith action, pursuant to the letter and spirit of the Agreement, of advising RRD of an opportunity to jointly offer Photography and Prepress Services to the Target, an agreed upon pre-existing client of SandBox, at Target's Minneapolis, Minnesota location in violation of Exhibit A to the Agreement; and refraining from

-16-

1  presenting and receiving a contract from Target, an agreed upon pre-existing client of SandBox,

2  for both Photography and Prepress Services in violation of Exhibit A to the Agreement after

3  refusing and failing to present a joint proposal to Target for Photography and Prepress Services.

4    60.    As a proximate result of defendants RRD, and Does 1-30 misrepresentation,

5  SandBox was induced to act in reliance on this  misrepresentation in the manner hereafter alleged,

6  or with the expectation that SandBox would so act.

7    61.    As a direct and proximate result of RRD's, and Does 1-30's misrepresentations,

8  SandBox has suffered damages in an amount to be proven at trial, but believed to be in excess of

9  the jurisdictional minimum of the Court together with accrued and unpaid interest thereon at the

10  legal rate, and SandBox has suffered direct consequential and special damages, including but not

11  limited to, lost profits.  SandBox will seek leave to amend this complaint to allege the precise

12  amount of such damage when the same has been ascertained.

13    WHEREFORE, SandBox  prays for relief as hereinafter set forth.

### EIGHTH CAUSE OF ACTION
14  #### (Imposition of Constructive Trust  Against All Defendants)

15    62.    SandBox  alleges and incorporates herein by reference Paragraphs 1 through 61

16  inclusive, of the complaint as though fully set forth herein.

17    63.    In or about at least 2006 onwards, RRD, and Does 1-30 and each of them, by

18  means of false and fraudulent representations wrongfully misappropriated and converted

19  SandBox' right: of first refusal to sell, co-sell or provide such photography services to the retail

20  chain "Meryvn's" in connection with a Request For Proposal issued by Mervyn's in connection

21  with Section 2.3 of the Agreement; to have RRD seek SandBox' consent prior to engaging in

22  discussions to provide Facilities Management services to such businesses as Mervyn's; to receive

23  a referral fee in connection with SandBox' good faith action, pursuant to the letter and spirit of

24  the Agreement, of advising RRD of an opportunity to jointly offer Photography and Prepress

25  Services to the Target, an agreed upon pre-existing client of SandBox; and to have RRD refrain

26  from presenting and receiving a contract from Target, an agreed upon pre-existing client of

27  SandBox, for both Photography and Prepress Services in violation of Exhibit A to the Agreement

28
-17-

1   after refusing and failing to present a joint proposal to Target for Photography and Prepress

2   Services.

3       64.    By virtue of   RRD's, and Does 1-30 and each of their wrongful acts, said

4   defendants hold the misappropriated and converted value of SandBox' right: of first refusal to

5   sell, co-sell or provide such photography services to the retail chain "Meryvn's" in connection

6   with a Request For Proposal issued by Mervyn's in connection with Section 2.3 of the

7   Agreement; to have RRD seek SandBox' consent prior to engaging in discussions to provide

8   Facilities Management services to such businesses as Mervyn's; to receive a referral fee in

9   connection with SandBox' good faith action, pursuant to the letter and spirit of the Agreement, of

10  advising RRD of an opportunity to jointly offer Photography and Prepress Services to the Target,

11  an agreed upon pre-existing client of SandBox; and to have RRD refrain from presenting and

12  receiving a contract from Target, an agreed upon pre-existing client of SandBox, for both

13  Photography and Prepress Services in violation of Exhibit A to the Agreement after refusing and

14  failing to present a joint proposal to Target for Photography and Prepress Services.

15          WHEREFORE, SandBox  prays for relief as hereinafter set forth.

16                          **NINTH CAUSE OF ACTION**
                            **(Accounting Against All Defendants)**

17      65.    SandBox  alleges and incorporates herein by reference Paragraphs 1 through 64

18  inclusive, of the complaint as though fully set forth herein.

19      66.    As a matter of law, SandBox is entitled to a full and complete accounting in order

20  to determine the value of SandBox' right: of first refusal to sell, co-sell or provide such

21  photography services to the retail chain "Meryvn's" in connection with a Request For Proposal

22  issued by Mervyn's in connection with Section 2.3 of the Agreement; to have RRD seek

23  SandBox' consent prior to engaging in discussions to provide Facilities Management services to

24  such businesses as Mervyn's; to receive a referral fee in connection with SandBox' good faith

25  action, pursuant to the letter and spirit of the Agreement, of advising RRD of an opportunity to

26  jointly offer Photography and Prepress Services to the Target, an agreed upon pre-existing client

27  of SandBox; and to have RRD refrain from presenting and receiving a contract from Target, an

28

-18-

agreed upon pre-existing client of SandBox, for both Photography and Prepress Services in violation of Exhibit A to the Agreement after refusing and failing to present a joint proposal to Target for Photography and Prepress Services.

WHEREFORE, SandBox prays for judgment as follows:

<u>PRAYER</u>

1. On the **First, Second, and Seventh Causes of Action**:

   a. Damages in the principal sum of to be determined at the time of trial but in a sum no less than the jurisdictional minimum of the Court, which damages include direct consequential and special damages, including but not limited to, lost profits.;

   b. Interest thereon at the legal rate from the date of breach, until paid;,

2. On the **Third through Sixth Causes of Action**:

   a. Damages in the principal sum of to be determined at the time of trial but in a sum no less than the jurisdictional minimum of the Court, which damages include direct consequential and special damages, including but not limited to, lost profits; and

   b. Punitive damages in an amount to be determined at the time of trial;

3. On the **Eighth Cause of Action against All Defendants**:

   a. For the value of the right of first refusal and right to require consent converted in the principal sum to be determined at the time of trial but in a sum no less than the jurisdictional minimum of the Court, which value include direct consequential and special damages, including but not limited to, lost profits;

   b. Interest thereon at the legal rate from the date of breach, until paid;

4. On the **Ninth Cause of Action**:

   a. For a full and complete accounting in order to determine the value of SandBox' right: of first refusal to sell, co-sell or provide such photography services to the retail chain "Meryvn's" in connection with a Request For Proposal issued by

-19-

1    Mervyn's in connection with Section 2.3 of the Agreement; to have RRD seek

2    SandBox' consent prior to engaging in discussions to provide Facilities

3    Management services to such businesses as Mervyn's; to receive a referral fee in

4    connection with SandBox' good faith action, pursuant to the letter and spirit of the

5    Agreement, of advising RRD of an opportunity to jointly offer Photography and

6    Prepress Services to the Target; and to have RRD refrain from presenting and

7    receiving a contract from Target for both Photography and Prepress Services in

8    violation of Exhibit A to the Agreement after refusing and failing to present a

9    joint proposal to Target for Photography and Prepress Services;

10    b.  For a judgment in favor of SandBox and against defendants for the amount found

11    due under such accounting.

12    5.   On **All Causes of Action against all Defendants**:

13    a.  For costs of suit and expenses incurred herein; and

14    b.  For such other and further relief as the Court may deem just and proper.

15    DATED: September 10, 2008        **NIESAR & WHYTE LLP**

16

17                By:   /s/ Robert O. Whyte

18                    Robert O. Whyte
                        Attorneys for Plaintiff/Counter-Defendant

19                    PicketFence, Inc. doing
                        business as SandBox Studio

20

21

22

23

24

25

26

27

28

-20-

# Exhibit A

## STRATEGIC ALLIANCE AGREEMENT

This Strategic Alliance Agreement ("Agreement"), effective as of February 18, 2005 ("Effective Date") is entered into by and between R. R. Donnelley & Sons Company, 77 Wacker Dr., Chicago, Illinois 60601 with day-to-day sales and operations conducted by Iridio, Inc. ("Iridio"), with its principal place of business at 5050 1st Avenue S., Seattle, Washington 98134, and Picket Fence, Inc. d/b/a SandBox Studio ("SandBox"), with its principal place of business at 555 Minnesota Street, San Francisco, California 94107.

WHEREAS, SandBox and Iridio provide complementary services to clients in the areas of digital photography and Prepress services; and

WHEREAS, SandBox and Iridio wish to set forth the terms of an ongoing, cooperative business relationship;

NOW THEREFORE, the parties have agreed as follows:

1.   DEFINITIONS

As used herein, the following terms have the following meanings:

"Photography Services" means digital and film photography services, both still and interactive, including such services provided on-site at a client facility located in the Territory in a Facilities Management arrangement.

"Prepress Services" means scanning, color correction, image manipulation, page assembly, production of proofs to provide press-ready, final page elements, and digital asset management services, including such services provided on-site at a client facility located in the Territory in a Facilities Management arrangement.

"Facilities Management" (FM) accounts will be defined as a classification that may include but not limited to the following factors: the presence of "on-site" or "near-site" RRD employees is required as a part of the agreement and/or the Account requires significant resources requiring workflow analysis and infrastructure investment to enable the appropriate solution.

"Territory" means the San Francisco metropolitan area, bounded by the northernmost boundary of Mendocino, Interstate 5, the southernmost boundary of San Luis Obispo and the Pacific Ocean.

2.   CUSTOMER REFERRALS

2.1   Each of SandBox and Iridio will identify on a project-by-project basis any clients or prospects whose corporate headquarters or other facilities purchasing Photography Services or Prepress Services are located in the Territory and may benefit from the services provided by the

other party. The Photography Services and Prepress Services may be provided at any location within or outside the Territory.

2.2    All Prepress Service opportunities identified by the SandBox sales team in the Territory will be referred exclusively to Iridio, through a central contact to be identified by Iridio. Iridio shall have a right of first refusal to sell, co-sell and provide Prepress Services. If Iridio declines an opportunity, SandBox may refer the business elsewhere, and Iridio will not participate in the Prepress Services revenue stream. Sandbox will obtain Iridio's prior consent before engaging in discussions to provide Facilities Management services to a then-current Iridio Prepress Services customer

2.3    All Photography Service opportunities identified by the Iridio sales team in the Territory will be referred exclusively to SandBox, through a central contact to be identified by SandBox. SandBox shall have a right of first refusal to sell, co-sell or provide such services to Iridio clients. If SandBox declines an opportunity, Iridio may refer the work elsewhere, and Sandbox will not participate in the Photography Services revenue stream. Iridio will obtain Sandbox' prior consent before engaging in discussions to provide Facilities Management services to a then-current Sandbox Photography Services customer.

2.4    Attached hereto as Exhibit A is a schedule detailing the payment arrangements agreed by the parties for customer referrals provided by the other party and any other new business. Exhibit A include lists of current customers of both parties for which no referral payments shall be made. Exhibit A also includes lists of customers for whom no referral payments will be made. No referral fees shall be due or payable for any Prepress Services or Photography Services provided by either party following expiration or termination of this Agreement.

2.5    The parties will jointly establish a formal inquiry process for the Iridio and SandBox sales teams to follow when a Photography or Prepress Services opportunity in the Territory arises. Each party shall acknowledge receipt within two (2) business days, and shall provide the other party a general plan of action within four (4) business days, after a sales referral is made by the other party.

2.6    Iridio shall enter into such contracts with clients as it deems appropriate to provide the Prepress Services and shall be solely responsible and liable for the Prepress Services. SandBox shall enter into such contracts with clients as it deems appropriate to provide the Photography Services and shall be solely responsible and liable for the Photography Services. The company of record who is responsible for handling the billing is also responsible for performing both the credit checks and the collection processes.

2.7    Both parties will maintain a direct sales force and remain unrestricted in the deployment of their respective sales forces. However, both parties agree to work together to develop a sales coordination and communication process to minimize channel and customer conflict. Each party shall provide a one-day training session on its services and processes to the other party's sales representatives.

- 2 -

2.8    Each party shall have the right to review and approve in advance of publication or distribution any marketing or collateral material that includes such party's name, or the names of any of its subsidiaries, affiliates or divisions.

2.9    Concurrent with the execution of this Agreement, the parties will enter into a License Agreement in the form attached hereto as Exhibit B, pursuant to which Iridio will establish a prepress operation at SandBox's offices in San Francisco. During the term of this Agreement, Sandbox agrees that it will not permit any other prepress services provider to establish a similar operation at its offices. Iridio will use commercially reasonable efforts to mesh such operation with the entrepreneurial culture of SandBox, and recognizes that said culture is a component of the parties' mutual, ongoing success.

2.10    During the first quarter of each year in which this Agreement is in effect (beginning in 2006), representatives of the parties shall meet to discuss the terms of this Agreement, shared goals and structure and any adjustments to this Agreement or the relationship between the parties that may be necessary or desirable.

3.    OWNERSHIP AND LICENSING

3.1    Each party will retain all rights, title and interest in and to all pre-existing materials and any such materials enhanced by either party during this Agreement, and all new materials developed by it under this Agreement, including but not limited to trade name and trademarks owned or used by either party and its subsidiaries, affiliates and divisions ("Intellectual Property"). This Agreement may not be construed to grant either party any license to use the Intellectual Property of the other party except in such form and manner as the owning party may approve in advance in writing for the purpose of providing the services described herein.

3.2    Each party grants to the other party the right to include the granting party's company name on the other party's customer list and agrees to provide a link to the other party's web site.

3.3    Iridio grants to SandBox a paid-up limited license to use Iridio's suite of online digital asset management tools, the current version of which is called "MediaCompass™", and any improvements, enhancements or replacements of such software and only with regard to jointly served customers of Iridio and SandBox. The foregoing license shall be in effect during the Term and shall continue thereafter only with respect to joint customers who were users of the software as of the date of expiration or termination of this Agreement. Iridio acknowledges that SandBox has its own version of such software which it considers SandBox Intellectual Property, and understands that SandBox will continue to use that software during the Term of this Agreement and thereafter, whether in its current version or as enhanced or improved by SandBox.

4.    WARRANTIES

4.1    Each party represents and warrants that (i) it has the full power and authority to enter into this Agreement and perform its obligations under this Agreement; and (ii) it will not violate any applicable laws or agreements with third parties in performing its obligations under this Agreement.

- 3 -

4.2 THE WARRANTIES SET FORTH ABOVE ARE THE SOLE AND EXCLUSIVE WARRANTIES OF THE PARTIES RELATED TO THIS AGREEMENT AND THE PARTIES SPECIFICALLY DISCLAIM ALL OTHER WARRANTIES, INCLUDING WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

5. **INDEMNIFICATION.** Each party agrees to indemnify and hold harmless the other (including its officers, directors, members, agents and employees) for and against any claim or damage caused by any breach of the indemnifying party's warranties contained in this Agreement, or based upon any claim asserted by a client or other third party arising out of the services provided by the indemnifying party. If a party becomes aware of a claim upon which it may have a right to indemnification, the indemnified party will promptly notify the other party in writing of the claim and will allow the other party to assume full control of the defense and settlement of the claim. The indemnified party will provide the other party with reasonable assistance and information necessary to defend and settle the claim. The indemnified party's counsel shall have the right to participate in the defense and settlement of the claim, at such party's own expense.

6. **LIMITATION OF LIABILITY.** Except for third party claims for which one party has an indemnification obligation to the other under Section 5(b), neither party will be liable to the other party for any incidental, indirect, special or consequential damages, including, but not limited to, loss of use, revenues, profits or savings, even if that party knew or should have known of the possibility of such damages.

7. **TERM AND TERMINATION**

7.1 The term of this Agreement will begin on the Effective Date and will continue for a period of five (5) years unless terminated as provided in this Section. Thereafter, it will automatically renew for additional one (1) year terms unless terminated as provided in this Section.

7.2 Either party may terminate this Agreement if:

(a) the other party breaches any material terms or conditions of this Agreement and fails to cure such breach within thirty (30) business days after receipt of written notice of such default by the non-defaulting party;

(b) the other party becomes insolvent or bankrupt, assigns all or a substantial part of its business or assets for the benefit of creditors, permits the appointment of a receiver for its business or assets, becomes subject to any legal proceeding relating to insolvency, reorganization or the protection of creditors' rights or otherwise ceases to conduct business in the normal course; or

(c) it is otherwise dissatisfied with the performance of the other party (e.g., quality issues resulting in excessive non-billable reshoots), provides written notice specifying in reasonable detail the cause of dissatisfaction and the steps the other party may take to

- 4 -

resolve the issue and the other party fails to implement such steps within sixty (60) days after receipt of the notification.

Sections 3-6 shall survive any termination of this Agreement.

## 8. SALE OF SANDBOX BUSINESS

8.1     If at any time during the term of this Agreement, SandBox desires to sell its business, or the shareholders of SandBox desire to sell fifty percent or more of the voting stock of SandBox to one or more persons who are not then shareholders of SandBox (a "Change of Control"), SandBox shall first offer to Iridio the right to purchase the assets or shares that are intended to be put up for sale in such Change of Control transaction, specifying a price and the terms upon which Iridio will have the right to purchase such assets or shares (the "Offer"). Iridio shall have a period of thirty (30) days following the date of such Offer to accept the Offer, but shall have no obligation to accept the Offer. If Iridio accepts the Offer, the parties shall promptly negotiate in good faith and sign a Letter of Intent.

8.2     If Iridio does not accept the Offer and complete the transaction described in the Offer on the terms and conditions set forth in the Letter of INtent, SandBox shall have the right to pursue sale of the assets or shares that were the subject of the Offer to any third party or parties, provided the sale to such third party or parties is on terms no more favorable to such third party purchaser(s) than those contained in the Offer.

8.3     If Iridio has declined an Offer and the Change of Control transaction is consummated with a third party or parties, Iridio may terminate this Agreement at any time after such third party transaction is consummated by giving SandBox ten (10) days' written notice of termination.

8.4     If a third party transaction is consummated pursuant to Section 8.3 and the transaction requires an assignment of this Agreement to a third party purchaser, Iridio may, in its sole discretion, consent or refuse to consent to the assignment of this Agreement. If consent is given, SandBox shall require the purchaser concurrently with the consummation of such sale, to assume all its obligations under this Agreement by an instrument in writing satisfactory to Iridio. If Iridio does not consent to the assignment, this Agreement shall terminate upon the closing of the Change of Control transaction.

8.5     In the event of termination of this Agreement for any reason, SandBox will retain all then-current photography customers and Iridio will retain all then-current prepress customers.

8.6     Iridio (or its parent company, R. R. Donnelley & Sons Company or any subsidiary thereof) will consider making an equity investment in SandBox in the future whether or not SandBox proposes a Change of Control transaction with any third party.

## 9. GENERAL

9.1    **Entire Agreement.** This Agreement sets forth the entire agreement and understanding of the parties relating to its subject matter and merges all prior discussions between them. No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement will be effective unless in writing signed by both parties.

9.2    **Notices.** Any notice required or permitted by this Agreement will be deemed given when received if sent via overnight courier to the address shown at the beginning of this Agreement or such other address as provided in writing to the other party.

9.3    **Force Majeure.** Non-performance of either party will be excused to the extent that failure to perform is beyond the reasonable control and not caused by the negligence of the non-performing party. Whenever possible, any schedule or time for performance set out in this Agreement shall be extended as necessary to overcome the effects of such force majeure.

9.4    **Waiver.** The failure of either party to enforce any of the provisions of this Agreement may not be construed as a waiver of that or any other provision of this Agreement.

9.5    **Severability.** If any provision of this Agreement is held to be invalid or unenforceable, such provision will be deemed severable and the remainder of this Agreement will be deemed to be unaffected.

9.6    **Independent Contractors.** The parties are neither partners nor joint venturers hereunder, and neither party has the power to obligate or bind the other in any manner whatsoever. Each party agrees that it will represent itself as an independent contractor and not as an agent of the other.

9.7    **Third Party Beneficiary.** Except as may be otherwise specifically provided in this Agreement no individual or firm, corporation, partnership, or other entity is a third-party beneficiary of the representations, warranties, covenants, and agreements made by either party to this Agreement.

9.8    **Governing Law.** This Agreement, including all Exhibits attached hereto, is governed by the laws of the State of California.

- 6 -

9.9   Assignment. Neither party may assign this Agreement without the prior written consent of the other party. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. A change of control of Iridio, Inc. shall be deemed to be an assignment subject to the consent

The parties, intending to be legally bound, have had this Agreement executed by their duly authorized representatives.

R. R. Donnelley & Sons Company

By: _MyLG Schnull_

Name: _MARY LEE SCHNEIDER_

Title: _PRESIDENT, PREMEDIA TECHNOLOGIES_

Picket Fence, Inc. d/b/a SandBox Studio

By: _Matt K_

Name: _MATT KWAN_

Title: _OWNER_

**EXHIBIT A**
Referral Fees

1. Except as provided in paragraph 7 of this Exhibit, Iridio shall pay SandBox a referral fee for any and all new Prepress Services performed by Iridio during the term of this Agreement. This applies to clients inside the Territory, whether or not services are provided within said Territory. Except as provided in paragraph 8 of this Exhibit, SandBox shall pay Iridio a referral fee for any and all new Photography Services performed by SandBox during the term of this Agreement. This applies to clients inside the Territory, whether or not services are provided within said Territory. Except as provided in paragraphs 2-4 of this Exhibit, the referral fee will be 8% of gross sales (as defined in paragraph 5 below) in both cases.

2. Existing Prepress Services customers of SandBox will be transferred to Iridio upon the Effective Date. Iridio will pay SandBox a referral fee of 15% of gross sales for such customers.

3. Iridio will pay SandBox a referral fee of 12% of gross sales for Prepress Services performed by Iridio for Johnston Murphy, Design Within Reach & eLuxury.

4. For all Gump's Prepress Services performed by Iridio, Iridio will pay Sandbox a referral fee of 2.5% of gross sales.

5. Gross sales will be defined as total sales less pass-through costs including models, freelance shooters, freelance stylists, freelance assistants, catering and location fees. Any mark-up component of a party's pass-through costs shall be included in gross sales.

6. Each party shall report to the other within thirty (30) days after the end of each calendar quarter the referral fees that are owed to the other party. Any disputes shall be raised within five (5) business days after receipt of the other party's report, and the parties shall negotiate in good faith to resolve such disputes promptly. The party owing the greater amount shall pay the difference within ten (10) business days after receipt of the reports by both parties or resolution of any dispute.

7. No referral fees shall be payable by Iridio for Prepress Services provided to Mervyns, Dell, Good Guys, Haggin Marketing, Illuminations, Smith & Hawkin, Red Envelope, Restoration Hardware, Arthur Beren or Cost Plus.

8. No referral fees shall be payable by Sandbox for Photography Services provided to Mervyn's, Restoration Hardware, Gump's, Birkenstock, The North Face, Inc., Johnston & Murphy, Design Within Reach, The Body Shop, San Francisco Giants, Lunar Design Inc., Binger Catalog (Nickelodeon/MTV), Haggin Marketing, Hewlett-Packard, Wal-Mart, Smith & Hawkin, CNET, The Sak, AOL, Lucas Arts or Delta Dental.

- 8 -

**EXHIBIT B**
Form of License

THIS LICENSE AGREEMENT (this "Agreement") is effective as of the 18th day of February, 2005, between PICKET FENCE, INC., a California corporation dba Sandbox Studio ("Licensor") and R. R. DONNELLEY & SONS COMPANY, a Delaware corporation ("Licensee").

RECITALS

A. Licensor is the tenant pursuant to that certain Standard Industrial/Commercial Single-Tenant Lease-Gross dated March 1, 2004 (the "Lease") with Frank W. Brady, Jr. and Marcella M. Korwin, or their successors, as Trustee under the Brady Family Trust Agreement dated July 8, 1988, as landlord, relating to certain property commonly known as 535 and 555 Minnesota Street, San Francisco, California 94107 as more particularly described in the Lease (the "Property").

B. Pursuant to the Lease, Licensor has certain rights to the Property consisting of approximately 21,620 square feet (the "Leased Premises").

C. Contemporaneously with this Agreement, Licensee and Licensor are entering into a Strategic Alliance Agreement relating to an ongoing, cooperative business relationship (the "Strategic Alliance Agreement").

D. In connection with the Strategic Alliance Agreement, Licensee desires to use a portion of the Leased Premises, and Licensor desires to accommodate Licensee's desire subject to the terms and conditions set forth herein.

NOW, THEREFORE, WITNESSETH, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1. **Grant of License.** Subject to the terms of this Agreement, Licensor hereby grants to Licensee a license (the "License") to use a portion of the Leased Premises consisting of approximately 1,000 square feet as more particularly depicted on Exhibit A attached hereto (the "Licensed Premises"). The term of this License (the "Term") will commence as of the date this Agreement is fully executed (the "Commencement Date"), and shall terminate upon the first to occur of (a) termination of the Lease or (b) thirty (30) days following the expiration or termination of the Strategic Alliance Agreement (the "Termination Date"). This License is coupled with an interest and as a result, is not terminable upon will but rather shall only terminate in accordance with the terms and provisions set forth herein.

2. **License Fee.** Licensee shall pay to Licensor a monthly license fee payment of Three Dollars and Fifteen Cents ($3.15) per square foot of the portion of the Leased Premises licensed to Licensee (the "License Fee"). The License Fee shall be payable in advance on a monthly basis during the Term, without demand, set-off, claim, counterclaim or other deduction of any kind whatsoever except as otherwise set forth herein. Licensee shall pay the fee in the form of a check made payable to Licensor and remitted to SandBox Studio. If either the Commencement

Date or the Termination Date falls on a date other than the first day or the last day of a calendar month, respectively, the License Fee due for such fractional month shall be prorated on a per diem basis between Licensor and License.

3. <u>Utility Costs</u>. Licensor and Licensee agree that a charge of Fifteen Cents ($0.15) per square foot is included in the License Fee. This charge is for Licensee's share of the utility costs attributable to the Leased Premises. Six months after the Commencement Date and every 12 months thereafter, Licensor and Licensee shall use reasonable efforts to determine whether the License Fee shall be adjusted to reflect higher or lower utility costs attributable to Licensee's share of the utility costs of the Leased Premises. All other costs comprising the License Fee are fixed and shall not be adjusted during the Term.

4. <u>Permitted Use</u>. Licensee and Licensee's employees and representatives shall have access to the Licensed Premises for investing and operating complete prepress technology infrastructure including but not limited to Kodak/Fuji proofing, and Epson proofing. Licensee shall have the right to have one fulltime employee within the Licensed Premises during the Term providing technical support for Licensee and Licensor. Additionally, Iridio may provide Sandbox the option to integrate PMT production infrastructure and MediaCompass tools into their production processes.

5. <u>Improvements to the Licensed Premises</u>. Promptly following the Commencement Date but in any event within 60 days from the Commencement Date, Licensee will, at its sole cost and expense, perform certain improvements to the Licensed Premises, including without limitation, the construction of walls, electrical and network drops, and such other finishes desired by Licensee (collectively, the "<u>Tenant Installations</u>"). To the extent that the cost of the Tenant Installations is less than $100,000, Licensee shall use such remaining balance to purchase certain equipment necessary or desired by Licensor for Licensor's operations (the "<u>Equipment</u>"). Licensee shall purchase the Equipment chosen by Licensor (provided, however, Licensee shall have the right to approve the selection of such Equipment, which approval shall not be unreasonably withheld). During and after the Term, the Equipment shall remain the personal property of Licensee and Licensee shall remove the Equipment from the Leased Premises upon the expiration of the Term. Notwithstanding the foregoing, if the Expiration Date occurs on or after 3 years after the date of Licensee's purchase of the Equipment, Licensee shall convey the Equipment to Licensor at no charge via a bill of sale, with no representations or warranties as to the condition of the Equipment.

6. <u>Condition of Licensed Premises</u>. During the term of this Agreement, Licensee shall keep the Licensed Premises, free of odor and varmint and provide ordinary maintenance to the Property. Licensee acknowledges that the Licensed Premises is being delivered to Licensee "AS IS". Licensor disclaims all representations and warranties as to the condition of the Licensed Premises, including, but not limited to, any implied or express warranty of merchantability. Licensor and Licensee acknowledge and agree that neither party shall be liable for any repairs or replacements with respect to the Licensed Premises, except that Licensee will remain liable for repairs necessitated by its own use or negligence. Upon the Termination Date, Licensee shall quit and surrender to the Licensor the Licensed Premises in good order and condition (ordinary wear and tear and damage by casualty excepted) and Licensee shall remove all of its personal

property and equipment, if any, but shall not be required to remove any of the Tenant Installations.

7. <u>Shared Reception</u>. At no additional cost to Licensee, Licensor agrees to permit the Licensee to use the phone system of Licensor at the Leased Premises and shall further cause its receptionist at the Leased Premises to direct any calls directed to Licensee or its employees to Licensee during normal business hours. Licensee will incur costs for installation of and service for a dedicated line into Licensor's phone system. Additionally, Licensee pay for new phone sets located in the Licensed Premises.

8. <u>No Possessory Estate or Interest</u>. Licensor and Licensee acknowledge and agree that the grant of the License shall not give Licensee any possessory estate or interest in the Licensed Premises and Licensee shall only have access to and the right to enter upon and use the Licensed Premises for the purposes permitted herein.

9. <u>Default and Remedies</u>. If Licensee is in default of any obligation under this Agreement and fails to cure such default within five (5) days of written notice thereof, then Licensor may terminate this Agreement and the License granted hereby and pursue any and all remedies permitted by law or in equity.

10. <u>Compliance with Laws, Regulations and Ordinances</u>. Licensee covenants and agrees that it shall not use the Licensed Premises in any manner which violates the laws of the United States of America, the laws of the State of California or any ordinances or other regulations of any governing municipality or other political subdivision. Licensee acknowledges that it has received a copy of an unsigned draft of the Lease and that it will not violate the terms of the unsigned draft of the Lease.

11. <u>Licensee's Indemnity</u>. Licensee hereby agrees to indemnify, defend (with counsel reasonably acceptable to Licensor), and hold Licensor and its affiliates, partners, representatives, directors, officers, employees, lenders, successors and assigns harmless of and from all liability, loss, damages, costs, or expenses, including attorneys' fees on account of any injuries to the person or property of Licensor or any tenant on the Licensed Premises, or to any other person on said Licensed Premises for any purpose whatsoever, whether such person has entered upon the Licensed Premises with or without the express or implied invitation of Licensee, has trespassed or in any other way come to be upon the Licensed Premises, where such injuries are a result of the violation of provisions of this License by such person, or the result of the intentional act of any person, an accident, or any other occurrence.

12. <u>Licensor's Indemnity</u>. Licensor hereby agrees to indemnify, defend (with counsel reasonably acceptable to Licensee), and hold Licensee and its affiliates, partners, representatives, directors, officers, employees, lenders, successors and assigns harmless of and from all liability, loss, damages, costs, or expenses, including attorneys' fees on account of any injuries to the person or property of Licensee, or to any other person on said Leased Premises (except for the Licensed Premises) for any purpose whatsoever, whether such person has entered upon the Leased Premises with or without the express or implied invitation of Licensor, has trespassed or in any other way come to be upon the Leased Premises, where such injuries are a result of the

- 11 -

violation of provisions of this License by such person, or the result of the intentional act of any person, an accident, or any other occurrence.

13. Insurance. Licensee will maintain throughout the duration of this Agreement at its sole cost and expense Commercial general liability insurance against claims for bodily injury, personal injury, death or property damage occurring on, in or about the Licensed Premises, such insurance to afford protection of not less than $1,000,000 per occurrence and $2,000,000 in the aggregate with respect to bodily injury, personal injury, death to persons, and not less than $1,000,000 with respect to property damage. The initial $2,000,000 insurance requirement described in this Paragraph 13 may be satisfied by a plan of self insurance maintained by Licensee, on condition that Licensee shall furnish to Licensor, upon request, evidence that Licensee maintains such plan of self insurance.

14. Successors and Assigns. The rights of Licensee shall not be assignable, in whole or in part. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

15. Notices. Any notice, request, demand, approval, or consent to be given under this Agreement shall be made in writing and either deposited in the United States mail, postage prepaid, certified with return receipt requested, or delivered by hand (which may be through a messenger or recognized delivery, courier or air express service) and addressed as follows:

> To Licensor:
>
> Sandbox Studio
> 555 Minnesota Street
> San Francisco, CA 94107
> Attention: Matt Kwan

with a copy to:

> Gerald V. Niesar, Esq.
> Niesar-Curls Bartling
> 90 New Montgomery Street, Ste. 900
> San Francisco, CA 94104

> To Licensee:
>
> R. R. Donnelley & Sons Company
> 77 West Wacker Drive
> Chicago, Illinois 60601-1696
> Attention: President, Premedia Services

with a copy to:

> R. R. Donnelley & Sons Company
> 77 West Wacker Drive

- 12 -

Chicago, Illinois 60601-1696
Attention: Senior Vice President and General Counsel

Such requests, approvals, consents, notices and other communications shall be effective on the date of receipt (evidenced by the certified mail receipt) if mailed or on the date of hand delivery if hand delivered. If any such request, approval, consent, notice or other communication is not received or cannot be delivered due to a change in the address of the receiving party of which notice was not previously given to the sending party or due to a refusal to accept by the receiving party, such request, approval, consent, notice or other communication shall be effective on the date delivery is attempted. Any request, approval, consent, notice or other communication under this Lease may be given on behalf of a party by the attorney for such party given in the same manner and to the same parties as provided in the Lease.

16. <u>Applicable Law</u>. The terms and conditions of this Agreement shall be governed, interpreted, construed, regulated and enforced in accordance with the laws of the State of California, without giving effect to the principles of conflicts of laws thereof.

17. <u>No Joint Venture</u>. Nothing contained herein shall be construed or considered to create a joint venture, partnership or agency relationship between Licensor and Licensee.

18. <u>Severability</u>. If any term, covenant, condition or provision of this Agreement or the application thereof to any person or circumstance shall, at any time or to any extent be invalid or unenforceable, the remainder of this Agreement shall not be affected thereby and each remaining term, covenant, condition and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals as of the day and year first above written.

LICENSEE:                                          LICENSOR:

R. R. DONNELLEY & SONS COMPANY, a          PICKET FENCE, INC., a California corporation
Delaware corporation

By: _____                 By: _____
Name: _____               Name: _____
Title: _____              Title: _____

- 13 -

## LICENSE AGREEMENT

THIS LICENSE AGREEMENT (this "Agreement") is effective as of the 18th day of February, 2005, between PICKET FENCE, INC., a California corporation dba Sandbox Studio ("Licensor") and R. R. DONNELLEY & SONS COMPANY, a Delaware corporation ("Licensee").

### RECITALS

A. Licensor is the tenant pursuant to that certain Standard Industrial/Commercial Single-Tenant Lease-Gross dated March 1, 2004 (the "Lease") with Frank W. Brady, Jr. and Marcella M. Korwin, or their successors, as Trustee under the Brady Family Trust Agreement dated July 8, 1988, as landlord, relating to certain property commonly known as 535 and 555 Minnesota Street, San Francisco, California 94107 as more particularly described in the Lease (the "Property").

B. Pursuant to the Lease, Licensor has certain rights to the Property consisting of approximately 21,620 square feet (the "Leased Premises").

C. Contemporaneously with this Agreement, Licensee and Licensor are entering into a Strategic Alliance Agreement relating to an ongoing, cooperative business relationship (the "Strategic Alliance Agreement").

D. In connection with the Strategic Alliance Agreement, Licensee desires to use a portion of the Leased Premises, and Licensor desires to accommodate Licensee's desire subject to the terms and conditions set forth herein.

NOW, THEREFORE, WITNESSETH, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1. Grant of License. Subject to the terms of this Agreement, Licensor hereby grants to Licensee a license (the "License") to use a portion of the Leased Premises consisting of approximately 1,000 square feet as more particularly depicted on Exhibit A attached hereto (the "Licensed Premises"). The term of this License (the "Term") will commence as of the date this Agreement is fully executed (the "Commencement Date"), and shall terminate upon the first to occur of (a) termination of the Lease or (b) thirty (30) days following the expiration or termination of the Strategic Alliance Agreement (the "Termination Date"). This License is coupled with an interest and as a result, is not terminable upon will but rather shall only terminate in accordance with the terms and provisions set forth herein.

2. License Fee. Licensee shall pay to Licensor a monthly license fee payment of Three Dollars and Fifteen Cents ($3.15) per square foot of the portion of the Leased Premises licensed to Licensee (the "License Fee"). The License Fee shall be payable in advance on a monthly basis during the Term, without demand, set-off, claim, counterclaim or other deduction of any kind whatsoever except as otherwise set forth herein. Licensee shall pay the fee in the form of a check made payable to Licensor and remitted to SandBox Studio. If either the Commencement Date or the Termination Date falls on a date other than the first day or the last day of a calendar month, respectively, the License Fee due for such fractional month shall be prorated on a per diem basis between Licensor and License.

CHI-1457352v2

3. <u>Utility Costs</u>. Licensor and Licensee agree that a charge of Fifteen Cents ($0.15) per square foot is included in the License Fee. This charge is for Licensee's share of the utility costs attributable to the Leased Premises. Six months after the Commencement Date and every 12 months thereafter, Licensor and Licensee shall use reasonable efforts to determine whether the License Fee shall be adjusted to reflect higher or lower utility costs attributable to Licensee's share of the utility costs of the Leased Premises. All other costs comprising the License Fee are fixed and shall not be adjusted during the Term.

4. <u>Permitted Use</u>. Licensee and Licensee's employees and representatives shall have access to the Licensed Premises for investing and operating complete prepress technology infrastructure including but not limited to Kodak/Fuji proofing, and Epson proofing. Licensee shall have the right to have one fulltime employee within the Licensed Premises during the Term providing technical support for Licensee and Licensor. Additionally, Iridio may provide Sandbox the option to integrate PMT production infrastructure and MediaCompass tools into their production processes.

5. <u>Improvements to the Licensed Premises</u>. Promptly following the Commencement Date but in any event within 60 days from the Commencement Date, Licensee will, at its sole cost and expense, perform certain improvements to the Licensed Premises, including without limitation, the construction of walls, electrical and network drops, and such other finishes desired by Licensee (collectively, the "<u>Tenant Installations</u>"). To the extent that the cost of the Tenant Installations is less than $100,000, Licensee shall use such remaining balance to purchase certain equipment necessary or desired by Licensor for Licensor's operations (the "<u>Equipment</u>"). Licensee shall purchase the Equipment chosen by Licensor (provided, however, Licensee shall have the right to approve the selection of such Equipment, which approval shall not be unreasonably withheld). During and after the Term, the Equipment shall remain the personal property of Licensee and Licensee shall remove the Equipment from the Leased Premises upon the expiration of the Term. Notwithstanding the foregoing, if the Expiration Date occurs on or after 3 years after the date of Licensee's purchase of the Equipment, Licensee shall convey the Equipment to Licensor at no charge via a bill of sale, with no representations or warranties as to the condition of the Equipment.

6. <u>Condition of Licensed Premises</u>. During the term of this Agreement, Licensee shall keep the Licensed Premises, free of odor and varmint and provide ordinary maintenance to the Property. Licensee acknowledges that the Licensed Premises is being delivered to Licensee "AS IS". Licensor disclaims all representations and warranties as to the condition of the Licensed Premises, including, but not limited to, any implied or express warranty of merchantability. Licensor and Licensee acknowledge and agree that neither party shall be liable for any repairs or replacements with respect to the Licensed Premises, except that Licensee will remain liable for repairs necessitated by its own use or negligence. Upon the Termination Date, Licensee shall quit and surrender to the Licensor the Licensed Premises in good order and condition (ordinary wear and tear and damage by casualty excepted) and Licensee shall remove all of its personal property and equipment, if any, but shall not be required to remove any of the Tenant Installations.

7. <u>Shared Reception</u>. At no additional cost to Licensee, Licensor agrees to permit the Licensee to use the phone system of Licensor at the Leased Premises and shall further cause its receptionist at the Leased Premises to direct any calls directed to Licensee or its employees to Licensee during normal business hours. Licensee will incur costs for installation of and service for a dedicated line into Licensor's phone system. Additionally, Licensee pay for new phone sets located in the Licensed Premises.

CHI-1457352v2

8.   No Possessory Estate or Interest.   Licensor and Licensee acknowledge and agree that the grant of the License shall not give Licensee any possessory estate or interest in the Licensed Premises and Licensee shall only have access to and the right to enter upon and use the Licensed Premises for the purposes permitted herein.

9.   Default and Remedies.   If Licensee is in default of any obligation under this Agreement and fails to cure such default within five (5) days of written notice thereof, then Licensor may terminate this Agreement and the License granted hereby and pursue any and all remedies permitted by law or in equity.

10.   Compliance with Laws, Regulations and Ordinances.   Licensee covenants and agrees that it shall not use the Licensed Premises in any manner which violates the laws of the United States of America, the laws of the State of California or any ordinances or other regulations of any governing municipality or other political subdivision. Licensee acknowledges that it has received a copy of an unsigned draft of the Lease and that it will not violate the terms of the unsigned draft of the Lease.

11.   Licensee's Indemnity.   Licensee hereby agrees to indemnify, defend (with counsel reasonably acceptable to Licensor), and hold Licensor and its affiliates, partners, representatives, directors, officers, employees, lenders, successors and assigns harmless of and from all liability, loss, damages, costs, or expenses, including attorneys' fees on account of any injuries to the person or property of Licensor or any tenant on the Licensed Premises, or to any other person on said Licensed Premises for any purpose whatsoever, whether such person has entered upon the Licensed Premises with or without the express or implied invitation of Licensee, has trespassed or in any other way come to be upon the Licensed Premises, where such injuries are a result of the violation of provisions of this License by such person, or the result of the intentional act of any person, an accident, or any other occurrence.

12.   Licensor's Indemnity.   Licensor hereby agrees to indemnify, defend (with counsel reasonably acceptable to Licensee), and hold Licensee and its affiliates, partners, representatives, directors, officers, employees, lenders, successors and assigns harmless of and from all liability, loss, damages, costs, or expenses, including attorneys' fees on account of any injuries to the person or property of Licensee, or to any other person on said Leased Premises (except for the Licensed Premises) for any purpose whatsoever, whether such person has entered upon the Leased Premises with or without the express or implied invitation of Licensor, has trespassed or in any other way come to be upon the Leased Premises, where such injuries are a result of the violation of provisions of this License by such person, or the result of the intentional act of any person, an accident, or any other occurrence.

13.   Insurance.   Licensee will maintain throughout the duration of this Agreement at its sole cost and expense Commercial general liability insurance against claims for bodily injury, personal injury, death or property damage occurring on, in or about the Licensed Premises, such insurance to afford protection of not less than $1,000,000 per occurrence and $2,000,000 in the aggregate with respect to bodily injury, personal injury, death to persons, and not less than $1,000,000 with respect to property damage. The initial $2,000,000 insurance requirement described in this Paragraph 13 may be satisfied by a plan of self insurance maintained by Licensee, on condition that Licensee shall furnish to Licensor, upon request, evidence that Licensee maintains such plan of self insurance.

CHI-1457352v2

14. <u>Successors and Assigns</u>. The rights of Licensee shall not be assignable, in whole or in part. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

15. <u>Notices</u>. Any notice, request, demand, approval, or consent to be given under this Agreement shall be made in writing and either deposited in the United States mail, postage prepaid, certified with return receipt requested, or delivered by hand (which may be through a messenger or recognized delivery, courier or air express service) and addressed as follows:

<u>To Licensor</u>:

Sandbox Studio
555 Minnesota Street
San Francisco, CA 94107
Attention: Matt Kwan

with a copy to:

Gerald V. Niesar, Esq.
Niesar-Curls Bartling
90 New Montgomery Street, Ste. 900
San Francisco, CA 94104

<u>To Licensee</u>:

R. R. Donnelley & Sons Company
77 West Wacker Drive
Chicago, Illinois 60601-1696
Attention: President, Premedia Services

with a copy to:

R. R. Donnelley & Sons Company
77 West Wacker Drive
Chicago, Illinois 60601-1696
Attention: Senior Vice President and General Counsel

Such requests, approvals, consents, notices and other communications shall be effective on the date of receipt (evidenced by the certified mail receipt) if mailed or on the date of hand delivery if hand delivered. If any such request, approval, consent, notice or other communication is not received or cannot be delivered due to a change in the address of the receiving party of which notice was not previously given to the sending party or due to a refusal to accept by the receiving party, such request, approval, consent, notice or other communication shall be effective on the date delivery is attempted. Any request, approval, consent, notice or other communication under this Lease may be given on behalf of a party by the attorney for such party given in the same manner and to the same parties as provided in the Lease.

16. <u>Applicable Law</u>. The terms and conditions of this Agreement shall be governed, interpreted, construed, regulated and enforced in accordance with the laws of the State of California, without giving effect to the principles of conflicts of laws thereof.

17. <u>No Joint Venture</u>. Nothing contained herein shall be construed or considered to create a joint venture, partnership or agency relationship between Licensor and Licensee.

18. <u>Severability</u>. If any term, covenant, condition or provision of this Agreement or the application thereof to any person or circumstance shall, at any time or to any extent be invalid or unenforceable, the remainder of this Agreement shall not be affected thereby and each remaining term, covenant, condition and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals as of the day and year first above written.

LICENSEE:                                      LICENSOR:

R. R. DONNELLEY & SONS COMPANY, a              PICKET FENCE, INC., a California corporation
Delaware corporation

By: _____                    By: _____
Name: MARY LEE SCHNEIDER                         Name: MATT KWAN
Title: PRESIDENT, PREMEDIA TECHNOLOGY           Title: OWNER

CHI-1457352v2

**Exhibit A**

**Depiction of Leased Premises**

See Attached

